UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                          )<br>)<br>JOSEPH O'CONNOR                 ) | Cr. No. 04-10296-DPW |

**SENTENCING MEMORANDUM**
*(AMENDED 05/19/05)*

Joseph O'Connor ("the defendant"), by and through undersigned counsel, hereby submits this Sentencing Memorandum in order to aid the court in reaching the appropriate sentence in this matter. The defendant contends that the appropriate result in this case would be a sentence of one year of home confinement.

On February 3, 2005, the defendant pleaded guilty to a one-count indictment charging him with conspiracy to defraud the United States in violation of 18 U.S.C. § 371. This court has not yet sentenced the defendant. In a Pre-Sentence Investigation Report ("PSR") submitted to the court, the United States Probation Office concluded that, in accordance with the United States Sentencing Guidelines, the defendant's total offense level would be 13 and his criminal history category was I. A total offense level of 13 coupled with a criminal history category of I would yield a guideline sentencing range of 12 to 18 months in prison. The PSR, however, fails to consider the recent decision of United States v. Booker, 125 S. Ct. 738 (2005) where the United States Supreme Court held that the Sentencing Guidelines no longer impose a mandatory burden on the federal courts. Although district courts must consider the Guidelines as "guidelines" in their sentencing decisions, courts are no longer required to impose a sentence within the mechanistic strictures of the statutory grid. Rather, courts are free to consider a wide range of

factors when deriving the appropriate sentence including the history and characteristics of the individual defendant. Id. at 770.

Here, several factors warrant a sentence of 12 months of home confinement. First, other than this offense, the defendant has lived 68 years without a blemish on his record. The defendant has raised a family, served his country, and contributed to his community in a positive manner. This error in judgment should not erase a lifetime spent as an honest, hardworking, and contributing member of society. Second, the defendant has serious health issues that caution in favor of a sentence of home confinement rather than a term of imprisonment. Specifically, the defendant recently suffered a heart attack that required an extended period of hospitalization. Even the somewhat unyielding Sentencing Guidelines have long espoused home confinement as an alternative to prison for defendants with relatively low total offense levels that are old, ill and infirm. See USSG § 5H1.4. Finally, Joseph Cassidy ("Cassidy"), a codefendant in this case, received a split sentence of five months imprisonment and five months of home confinement. Cassidy, who masterminded and reaped the greatest benefits from the conspiracy, stands at least as culpable in this crime. Principles of fundamental fairness prescribe that a defendant should not serve a greater sentence than his equally or more culpable codefendant.

In accordance with Booker and 18 U.S.C. § 3553(a), the court should consider these factors when imposing sentence. Prior to Booker, the mandatory guidelines restricted courts to a narrow set of factors in deciding whether to grant a downward departure. Now, under an advisory guidelines system, courts need not confine their analysis to a rigid set of imprecise factors. Rather, courts can employ the guidelines along with other "humanizing" factors to determine a sentence that is reasonable under the circumstances. In the wake of Booker, these "humanizing" factors can emerge as critical components of the court's less restrictive sentencing analysis.

## **FACTS AND BACKGROUND**

The defendant is a 68-year-old man who stands convicted of conspiring to defraud the government by providing false information on housing loan applications. Born in Boston, Massachusetts on October 20, 1936, into a large Irish Catholic family, the defendant grew to maturity in an impoverished area of Dorchester. Growing up as one of ten children, the defendant's immigrant parents inculcated the defendant with values of hard work, loyalty, fidelity, and public service. The defendant's parents also instilled a romanticized sense of rugged individualism where America became a land of almost unparalleled opportunity for people to thrive based upon their verve and ambition rather than on their preordained family heritage. These notions and values became the cornerstone of the defendant's life.

The defendant married his fiancée, Carol Ann Teehan, on January 12, 1957. The couple plan to celebrate their 50th wedding anniversary in less than two years. Although the couple spent the early years of their marriage in Dorchester, they moved to Holbrook after the defendant's brother, Paul, advised them that Holbrook was an affordable, middle-class suburb ideal for raising a family. While living in Holbrook, the defendant's wife gave birth to their only child, a daughter who they named Caroline.

The defendant has remained devoted to his wife and child and his parents and siblings throughout his life. In addition to his wife, the defendant developed a particularly close bond with his brother, Paul. Although the defendant regarded military service to the United States as part of the fulfillment of his patriotic duty, he eschewed active military service in favor of the Army National Guard so that he could remain involved in the lives of his family.

The defendant's devotion to his family became evident even in his career choice. Driven by an entrepreneurial penchant instilled by his parents, the defendant and his wife developed a

commercial cleaning company known as O'Conco, Inc. ("O'Conco") in 1965. O'Conco provided cleaning services for residential and commercial customers. Although O'Conco initially was a two-person operation, it grew to include as many as twelve employees.

The defendant and his wife worked as a team at O'Conco. She handled the financial aspects of the business; he cleaned. As the business grew, the defendant's role became more supervisory, but he always personally participated in the cleaning of his commercial client's establishments. As a result, the defendant often worked grueling hours into the night and weekends.

One of the defendant's commercial clients was an apartment complex in Roslindale, Massachusetts known as Cummins Towers. Cummins Towers consisted of approximately 180 federally subsidized low income apartment units administered by a company known as First Realty Management Corporation ("FRM") acting on behalf of the United States Department of Housing and Urban Development ("HUD"). Individuals seeking to live in these low income apartments had to submit an application to HUD via FRM.

The defendant was very friendly with an FRM employee known as Joseph Cassidy ("Cassidy"). In 1988, Cassidy and his girlfriend, fellow FRM employee Janet Gaibl ("Gaibl"), approached the defendant about a plan to secure a vacant apartment in Cummins Towers. The pair convinced the defendant to help them obtain an apartment from the complex. Acting on his friend's suggestion, the defendant submitted a false application to Cassidy and Gaibl for a single unit. Years later, after Cassidy decided to use the apartment as his personal residence, Cassidy and Gaibl convinced him to apply for a second unit and, in 1997, after the second unit had problems with its electrical system, to abandon the second unit in favor of a third unit. The defendant used fictitious names, dates of birth, and social security numbers in order to obtain the

second and third apartments. He renewed the applications on the second apartment from 1991 until 1997. He renewed the applications on the first and third apartments annually until 2000.

The defendant did not share the information about his HUD acquisitions with his family. His wife reports that her husband is stoic and tends to internalize his problems. During the time period from 1998 to the present, the defendant certainly had his share of difficulties. Specifically, from approximately the late 1980's to 2005, the defendant has watched several members of his family die. His father, who instilled values of hard work in the defendant, died about 16 years ago. His mother died about six years ago. The defendant has also watched several of his siblings die from cancer. His sister, Mary, died from cancer in 1994. His sister, Catherine, died from cancer in 1999. His sister, Josephine, died from cancer in 2002. Although these deaths were agonizingly painful, the most crippling blow to the defendant came when his best friend and brother, Paul, passed away this past January. Paul's death has left the defendant emotionally traumatized. The importance of family loyalty ever part of the defendant's psyche, he personally cared for his siblings, particularly Paul, as cancer took their lives.

Reeling from his siblings' deaths, the defendant retired from O'Conco. He and his wife now live with their daughter and granddaughter at the daughter's home in South Dennis, Massachusetts. The defendant works part-time as a van driver for a nursing home on Cape Cod. The defendant and his wife intend to spend their "golden years" with their daughter and granddaughter.

The defendant's health poses perhaps an immediate threat to his long-term plans. Although the 68-year-old 5 feet 6 inches tall defendant initially claimed that he had no significant health problems, he does have an ominous lump on his chest. The defendant, who smokes more than two packs of cigarettes per day, however, believes that the lump is insignificant and refuses to

seek medical treatment.  More significantly, on April 15, 2004, the defendant suffered a near fatal heart attack.  Transported to Cape Cod Hospital in Hyannis, the defendant was diagnosed with acute anterior and possibly lateral myocardial infarction, and he was transferred to the catheter lab in critical condition.  The defendant remained in the hospital for almost one week.  Doctors at Cape Cod Hospital placed several stints in the defendant's arms and proscribed a regime of pills and rest.  Doctors believe that a prolonged period of rest at home is essential for the defendant's recovery and critical to his chance of survival.

## ARGUMENT

A.   The United States Supreme Court's Booker/Fanfan Decision Has Rendered The Sentencing Guidelines Advisory

On January 12, 2005, the United States Supreme Court issued its landmark United States v. Booker, 125 S. Ct. 138 (2005), decision.  In Booker, the Supreme Court held that the principles announced in Blakely v. Washington, 124 S. Ct. 2531 (2004), apply to the United States Sentencing Guidelines.  Blakely, a case interpreting the Supreme Court's earlier decision in Apprendi v. New Jersey, 530 U.S. 466 (2000), held that within a mandatory sentencing scheme where offense levels exist, the Sixth Amendment to the United States Constitution requires that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Blakely, 124 S. Ct. at 2537 (quoting Apprendi, 530 U.S. at 490).  The Blakely Court concluded that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*"  Blakely, 124 S. Ct. at 2537 (emphasis in original).  Booker applies the Blakely

Court's reasoning to the federal sentencing guidelines and holds that within the context of a mandatory sentencing system, the Sixth Amendment requires the government to prove any sentencing enhancement factors to a jury beyond a reasonable doubt. Booker, 125 S.Ct. at 749-750.

In a separate majority opinion, the Booker Court also declared that in light of its application of Blakely to the federal sentencing guidelines, the statutory provisions making the guidelines mandatory upon the federal courts are unconstitutional. Booker, 125 S. Ct. at 756-57. Hence, the sentencing guidelines are now advisory. Booker, 125 S.Ct. at 757; United States v. Sahlin, 2005 WL 407407 (1st Cir. Feb. 22, 2005). Although courts must still consider guideline ranges, they are also free to tailor the sentence in light of other statutory concerns such as the history and circumstances of the defendant. Booker, 125 S. Ct. at 757 (citing 18 U.S.C. § 3553(a) (Supp. 2004)). Rather than adhere to a strict and impersonal arithmetical formula, court must now derive a sentence that is reasonable given a host of factors including the defendant's record, the nature of the crime, and the facts and circumstances germane to each case. See Booker, 125 S. Ct. at 766-67.

B.  The Defendant's Personal Circumstances Warrant a Sentence of Home Confinement

The defendant is ill and infirm. He recently suffered a heart attack so debilitating that he remained hospitalized in Hyannis for nearly a week. Doctors placed several stints in his arm and issued a regimen of pills in order to forestall the defendant's heart disease. His doctors have issued a tentative prognosis for his survival based upon rest and recovery at home. Compounding his health problems is questionable lump on his chest amidst a family where many of his siblings have died from cancer. Moreover, the defendant is a 68-year-old man who stands at a mere five feet, six inches tall and weighs only 160 pounds. Given his age and frail condition, the defendant may be

unusually susceptible to abuse in prison.

Under the pre-Booker mandatory guidelines system, age was not ordinarily relevant as a ground for a downward departure. See USSG § 5H1.1. Even the pre-Booker regime, however, permitted departures based upon age "where a defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration." Id. Moreover, the guidelines and the courts have long recognized the acceptability of departures where a defendant appears highly susceptible to the possibility of abuse in prison. See Koon v. United States, 518 U.S. 81 (1996); USSG §§ 5H1.4 and 5K2.0.

Booker, with its declaration that the Sentencing Guidelines are advisory, has rendered the need for downward departures obsolete. The court need not consider whether this defendant fits squarely within the parameters set forth in the guidelines when fashioning the appropriate sentence. Instead, the court must examine the factors delineated in 18 U.S.C. § 3553(a), which include the nature of the crime committed, the defendant's criminal record, and the history and circumstances of the defendant. Here, the defendant has no criminal record. He is, however, elderly and infirm. More importantly, the defendant suffered a near fatal heart attack. Doctors have indicated that the defendant's optimal opportunity for survival may depend upon his continued rest and recovery in a non-stressful home environment. Balancing the defendant's age, serious health and physical condition, and lack of criminal record against the nature of the crime committed, home confinement emerges as a more effective and less costly alternative to incarceration.

As a person who accepts responsibility for his actions, the defendant expects this court to impose a form of punishment. Home confinement is punishment. One year of home confinement places a considerable burden on both the offender and his family. One year of home confinement is more than sufficient to rebuke this defendant for his criminal conduct. Society gains nothing by

incarcerating this defendant for several months. In fact, incarcerating this defendant will cost society far more than a sentence of home confinement. Moreover, given the defendant's serious heart condition, the court should impose a sentence that offers him the best chance of survival. Consistent with the policy statements expressed in § 5H1.4 of the guidelines and the 18 U.S.C. § 3553(a) factors, the court should impose a sentence of home confinement.

   C. <u>The Defendant Is Less Culpable Than His Codefendants</u>

On June 4, 2004, the defendant's coconspirator in this matter, Joseph Cassidy, pleaded guilty to one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371. On September 2, 2004, the court (Stearns, J.) sentenced Cassidy to serve a split sentence of five months in custody and five months of home confinement, which was the minimum possible sentence under the formerly mandatory guidelines system. Although the court credited him with a loss calculation figure of only $77,777, which represented the cost of one unit, Cassidy stands at least as culpable as the defendant in this matter.

Cassidy initiated this scheme. Cassidy approached the defendant and asked the defendant to secure a housing unit for him. The defendant complied and helped Cassidy obtain one of the Cummins Towers' subsidized apartments. Although the defendant initially had access to Cassidy's apartment for use during working hours, Cassidy soon turned the apartment into his personal residence following his divorce. In the early 1990's, the defendant no longer had access to Cassidy's apartment. Desiring the use of a Cummins Tower apartment, the defendant, following Cassidy's suggestion and Janet Gaibl's direction, in 1991 submitted a fictitious name on a HUD application. As this apartment, however, had problems with its electrical equipment, the defendant switched units in 1997 with Gaibl's assistance. The defendant kept this second unit until 2000.

The PSR credits the defendant with a total loss amount of over $125,000, which represents the

value of the three apartments during the applicable time period. Cassidy's PSR credits him with the loss amount of $77,777, which represents the loss amount of only his unit. The loss figures here are misleading and fail to capture the true measure of the defendants' relative culpability. The formerly mandatory Sentencing Guidelines place an inordinate amount of weight on loss in fraud cases. United States v. Emmanegger, 329 F.Supp.2d 416, 427 (S.D.N.Y. 2004). Loss is often a poor indicator of the moral seriousness of a particular crime. Id.; see also, United States v. Jaber, 2005 WL 605787, at *12 (D. Mass. March 16, 2005) (Gertner, J.) (quoting Emmanegger, 329 F.Supp.2d at 427).

Here, the relative loss amounts fail to capture the defendant's true role in the offense conduct. While the defendant certainly acknowledges the wrongfulness of his conduct, Cassidy was the mastermind behind this scheme. He received credit for only one unit despite the fact that he was the leader and organizer of this conspiracy. Cassidy also played a greater role in the overall conspiracy. For example, only Cassidy used his unit as an actual residence. The defendant never resided in a Cummins Tower apartment. With regard to Cassidy's apartment in particular, the PSR credits both Cassidy and the defendant with the same loss amount for Cassidy's unit throughout the applicable time period. Crediting the defendant with the full amount of the loss in this instance does not reflect the role of each codefendant. The defendant helped Cassidy acquire and keep his unit. Cassidy lived in the unit. From approximately 1991 to 2000, the defendant had virtually no access to a unit that had effectively become Cassidy's home. With regard to Cassidy's unit, the defendant played a far less culpable role in the conspiracy. In fact, considering Cassidy's role in initiating and perpetrating the fraud, the defendant certainly does not bear greater culpability than his codefendant. A mechanistic application of guideline loss amounts, however, does not capture the essence of

Cassidy's and the defendant's roles in the conspiracy.1

The court sentenced Cassidy to serve a split sentence of five months in custody and five months in home confinement. The court concluded at the sentencing hearing held on September 2, 2004 that Cassidy's total offense level was 12 and his criminal history category was I. A total offense level of 12 coupled with a criminal history category of I yields a guideline sentencing range of 10 to 16 months. Cassidy's total offense level and criminal history placed him in Zone C. The mandatory guidelines permitted a court to sentence a Zone C offender to half of his minimal time in custody with the remainder in home confinement. Cassidy's sentence, therefore, was the minimum that the court could impose under a formerly mandatory guidelines system.

Given that the court imposed the minimum sentence allowed under the mandatory guidelines, it is reasonable to conclude that the court likely would have imposed a lesser sentence under an advisory guidelines system. Had the mandatory guidelines permitted a straight sentence of home confinement, the court likely would have imposed it. This defendant, who is arguably less culpable than the mastermind Cassidy, should not receive a sentence commensurate with his codefendant simply because a formerly mandatory law prohibited the court from imposing a lower sentence. Moreover, Cassidy, at the age of 47 and 200 pounds, stands in sharp contrast to the frail 68-year-old defendant recovering from a near-fatal heart attack. The concerns regarding age, health, infirmity, and susceptibility to abuse in prison were not present in Cassidy's case. Here, a sentence of one year

---

1 Gaibl arguably played the most significant role in the conspiracy. As the person responsible for approving the HUD applications, she acted as an agent for the government. In knowingly permitting falsified information, Gaibl betrayed her fiduciary duty to the government. Moreover, Gaibl was the one constant link with all of the units involving both Cassidy and the defendant. As Cassidy's purported girlfriend, she, unlike the defendant, also at times resided in Cassidy's purloined apartment. Gaibl, however, has chosen to cooperate with the government in anticipation of a recommendation for a substantial assistance downward departure pursuant to USSG § 5K1.1. Ironically, despite the fact that she appears to be the most culpable of the three

of home confinement certainly serves as sufficient punishment and provides a less costly alternative to incarceration.

## **CONCLUSION**

For the foregoing reasons, the court should sentence the defendant to serve one year of home confinement.

Dated: May 19, 2005

                                      Respectfully submitted,
                                      JOSEPH O'CONNOR,
                                      By his attorneys,


                                      __//s Brad Bailey_____
                                      Daniel W. O'Malley, BBO#547483
                                      Brad Bailey, BBO#549749
                                      Gary G. Pelletier, BBO#631732
                                      DENNER O'MALLEY, LLP
                                      Four Longfellow Place, 35th Floor
                                      Boston, MA 02114
                                      (617) 227-2800

---

defendants, she likely will receive a sentence that does not involve a term of imprisonment.